889 A.2d 1108 (2006)
382 N.J. Super. 505
Melissa PHILLIPS, Plaintiff-Respondent,
v.
John GELPKE, Defendant-Appellant, and
Barbara Gelpke, Defendant,
John Gelpke, Defendant/Third-Party Plaintiff,
v.
Susan Phillips, Third-Party Defendant.
Superior Court of New Jersey, Appellate Division.
Argued December 20, 2005.
Decided January 30, 2006.
*1109 Kevin Kovacs, Bedminster, argued the cause for appellant (Purcell, Ries, Shannon, Mulcahy & O'Neill, attorneys; Mr. Kovacs, on the brief).
Richard J. Schachter, Bridgewater, argued the cause for respondent (Norris, McLaughlin & Marcus, attorneys; Mr. Schachter, on the brief).
Before Judges COBURN, COLLESTER and LISA.
The opinion of the court was delivered by
COBURN, P.J.A.D.
In 2001, Melissa Phillips, then nineteen years old, sued John and Barbara Gelpke, alleging that John had frequently abused her sexually from the time she was three until she was eight and that Barbara had negligently permitted the abuse to occur. Melissa alleged that her memory of the events had been repressed until she became eleven and had a dream of engaging in sexual relations with John as a young woman.
Before trial, Melissa submitted a psychologist's report in support of her claims. It described repressed memory, which the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) defined as "Dissociative Amnesia," but did not conclude that Melissa suffered from that condition; nor did it address the controversy among psychiatrists, psychologists and physicians respecting whether repressed memories can be accurately retrieved or retrieved at all. Consequently, on defendants' pretrial motion, the judge ruled that the although the expert could testify at trial on other aspects of the case, the testimony could not include the opinion that Melissa had dissociative amnesia.
During trial, the judge dismissed the claim against Barbara but permitted the jury to consider the claim against John. The jury found John liable and awarded compensatory damages of $750,000 but no punitive damages. After John's motion for judgment notwithstanding the verdict was denied, judgment was entered with interest and costs in the amount of $863,520.
John appeals, arguing primarily that the judge erred in permitting the case to go to the jury without expert testimony that Melissa's recall was the result of dissociative amnesia and without expert testimony explaining and supporting the concept that repressed memories may be recalled. Since we agree with him, we reverse. But, we also remand to permit Melissa to seek a new trial.

I
In 1985, John and Barbara Gelpke lived in New Jersey and operated a limousine service out of their home in Gladstone. Barbara's mother, Betsy Phillips, lived next door. In March, John went to Florida to pick up a car for a New Jersey client. At Betsy's request, John looked in Florida *1110 for Betsy's other daughter, Susan and Susan's three-year-old daughter, Melissa Phillips. Susan, a heroin addict, had recently moved to Florida with Melissa's father who was also a heroin addict. John found Susan and Melissa living in a filthy shack, reeking of vomit, urine, and alcohol. He persuaded Susan to allow him to take Melissa back to New Jersey to live with Betsy.
For the next two years, Melissa lived with Betsy but often visited John and Barbara. Susan returned to New Jersey, and in June 1987, Melissa, then age six, began living with her, but continued to see Betsy, Barbara and John on weekends. In 1989, Susan gave birth to Melissa's half-sister, Jessica, and Jesica's father, Laszlo Repas, began insisting that Melissa eat apart from the rest of the family. In 1990, Susan married Repas, who did not like Melissa and often referred to her as "fat," "stupid," and "retarded." That same year, Susan told Melissa that her father had been murdered in 1988.
In 1992, Melissa, then age eleven, had the dream that is of central importance to this case. She dreamed that she was almost twenty and was having sex with John. She said that after having the dream, she began to remember previously forgotten incidents of sexual abuse perpetrated on her by John and beginning when she was three years old on the trip back from Florida. She recalled that in New Jersey, John regularly abused her sexually while Barbara was taking a shower. He would permit her to "hump" him in bed and touch his penis while he touched her vagina. She recalled masturbating in front of him at his request and playing with his erect penis while he spoke on the telephone. She recalled him telling her to tell no one so he would not get into trouble. She said she stopped engaging in these sexual activities when she was eight out of embarrassment after two girl scouts came to his door and possibly saw her "humping" John in the living room. She said that he apologized thereafter and said that he was happy she had not told anyone about what he had done.
In 1995, Melissa told Susan about the abuse, and Susan confronted Barbara with the information in Melissa's presence, but Melissa was too upset to discuss it. Over the next three years, she had no contact with John or Barbara. In 1998, Melissa complained to the Somerset County Prosecutor's office, but no prosecution ensued.
Melissa described a childhood marred by numerous difficulties apart from John's alleged sexual abuse. Starting at age thirteen, she received out-patient and in-patient treatment for an eating disorder, and she continued with psychological therapy until 2002, although at that time she still hated her body and purged on occasion. She was adversely affected by her parents' drug addiction, her mother's promiscuity while on drugs, which she had witnessed first-hand, the violent death of her father, the verbal abuse she endured from Repas, and the violent death of one of her boyfriends who was high on heroin when he was run over by a train. She also saw a close friend accidentally set herself on fire, resulting in severe burns, and she was date-raped when she was sixteen.
Melissa's expert witness, Dr. Madelyn Milchman, a psychologist, testified at some length about Melissa, whom she had interviewed for thirty hours in 2002 and 2003. But that testimony need not be described in detail because the legally significant point is not what she said, but rather, what she did not say. In short, although she said that the dream could act as a "recall cue" of the sexual abuse, she neither diagnosed Melissa as having suffered from dissociative amnesia, nor justified the concept of accurate retrieval of repressed memories.
*1111 Before presenting testimony, John moved for dismissal because, among other things, no expert testimony had been presented to support the claim that repressed memory was a valid psychological theory. The judge denied the motion, expressing the view that recalling events after a dream, as occurred here, was "not very different from the way that people remember events from the distant past," and adding that it is "not unusual . . . for people not to remember certain things at [one] time and then something triggers their memory." John denied that he either abused Melissa or apologized to her. John's expert witness was Dr. William Campagna, a psychologist, who attributed Melissa's problems to all of the traumas she had experienced other than the alleged abuse by John. He also said that it was unlikely that Melissa repressed the alleged abuse.

II
As noted, John's primary argument is that the judge erred in denying his motions for a directed verdict and judgment notwithstanding the verdict. Consequently, in deciding whether a cause of action was established, we must accept "as true all of the evidence which supports" Melissa and must accord her "the benefit of all inferences which can reasonably and legitimately be deduced therefrom." Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969). But we are not concerned here with the weight of the evidence. Rather, the question is whether a case based on repressed memories can be submitted to a jury without expert testimony diagnosing the alleged victim as having dissociative amnesia and explaining and justifying the concept that repressed memories can be accurately recalled.
In 1992, the New Jersey Legislature adopted the Sexual Abuse law, N.J.S.A. 2A:61B-1, establishing a statutory civil action for sexual abuse of minors. Although Melissa's complaint did not expressly seek relief under that law (which may explain why she did not seek, and the judge did not award, counsel fees, despite N.J.S.A. 2A:61B-1h), it is relevant in one respect: the statute provides that the action "shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse," N.J.S.A. 2A:61B-1b, and states that "[n]othing in this act is intended to preclude the court from finding that the statute of limitations was tolled in a case because of the plaintiff's mental state, duress by the defendant, or any other equitable grounds." N.J.S.A. 2A:61B-1c (emphasis added). Although neither dissociative amnesia nor repressed memory is mentioned in the statute, the accompanying Senate legislative statement cites repressed memory as a basis for tolling:
Because of the unique nature of sexual abuse, which may only be discovered by an adult victim after years of repression, the bill provides that a civil suit for sexual abuse shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse.
[Senate Judiciary Committee Statement to S. 257 (enacted as L. 1992, c. 109) (emphasis added).]
In Dattoli v. Yanelli, 911 F.Supp. 143, 147 (D.N.J.1995), the court construed the statute as giving plaintiff an opportunity to prove that "awareness . . . was repressed" to avoid application of the usual statute of limitations. The court then cited case-law supporting the rule that expert testimony would be required on the subject of repressed memory and ultimately concluded that plaintiff, who had not yet offered proof of repression other than his own assertion, was entitled to an opportunity to do so. Id. at 147-48. Another panel of this court in dictum has read *1112 Dattoli as not requiring expert testimony on repressed memory to avoid the usual statute of limitations in a sexual abuse case. D.M. v. River Dell Reg'l High Sch., 373 N.J.Super. 639, 648, 862 A.2d 1226 (App.Div.2004). Although the court's opinion in Dattoli is less than crystal clear on this point, we believe our reading is correct. But more importantly, we cannot endorse D.M.'s suggestion that a repressed memory case may proceed in any context without expert testimony. Id. at 649, 862 A.2d 1226. Expert testimony is required when the subject is "so esoteric that jurors of common judgment and experience cannot form a valid judgment" without it. Scully v. Fitzgerald, 179 N.J. 114, 127, 843 A.2d 1110 (2004) (citation omitted).
In Scientific Consensus on Memory Repression and Recovery, 51 Rutgers L.Rev. 275 (1999), Professor Robert Timothy Reagan reviewed reports issued by seven national scientific societies in four English-speaking countries on disassociative amnesia. He noted that the American Medical Society considers the "existence of repression as considerably controversial and declares recovered memory reports to be unreliable without corroboration." Id. at 290, 843 A.2d 1110. He described the Royal College of Psychiatrists as taking "no clear stand on whether memory repression and recovery exists." Id. at 296, 843 A.2d 1110. He noted that the "Australian Psychological Society was skeptical about the existence of repression and declared recovered memory reports to be unreliable without corroboration." Id. at 297, 843 A.2d 1110. And he similarly described the position of the Canadian Psychiatric Association. Id. at 299, 843 A.2d 1110. Based on his reading of a number of reports issued by the American Psychological Association, he found that "a fierce debate rages on whether memories of [childhood sexual] abuse can be repressed for a time and then accurately recovered later." Id. at 319, 843 A.2d 1110. Ultimately Professor Reagan concluded that there was an absence of general acceptance of memory repression:
The scientific principle of memory repression, where an individual's consciousness is denied access to traumatic memories until the individual is psychologically competent to cope with the memories, has simply not achieved general acceptance among memory scientists. This lack of acceptance is true, regardless of whether the purported phenomenon is called repression, dissociation, or anything else. In fact, the scientific evidence supporting the repression principle is remarkably weak.
[Ibid.]
We have cited Professor Reagan's article, not for the purpose of endorsing his conclusion, but rather to show that repressed memory is, at least, a highly complex and controversial subject, and one which should not be considered by a jury without expert testimony. Since our Legislature has implied some support for the concept, we ought not reject it without a full record on the subject. But nothing in the Sexual Abuse statute implies that a plaintiff may rely on the recollection of repressed memories without the aid of an expert witness.
In other jurisdictions, courts have uniformly concluded that expert testimony is required in this context. See, e.g., Shahzade v. Gregory, 923 F.Supp. 286, 287-90 (D.Mass.1996); Mary D. v. John D., 264 Cal.Rptr. 633, 640, 216 Cal.App.3d 285 (1989); State v. Hungerford, 142 N.H. 110, 697 A.2d 916 (1997); Barrett v. Hyldburg, 127 N.C.App. 95, 487 S.E.2d 803, 805-07 (1997); Moriarty v. Garden Sanctuary Church of God, 334 S.C. 150, 511 S.E.2d 699, 709-10 (Ct.App.1999), aff'd, 341 S.C. 320, 534 S.E.2d 672 (2000).
*1113 In Hungerford, supra, the Supreme Court of New Hampshire rejected the prosecution's contention that expert testimony was not required on the subject of repressed memory and offered this helpful analysis:
Although there are skeptics, it does seem to be accepted in the psychological community that people are capable of repressing or dissociating conscious recollection of all or part of certain traumatic events. There is, however, a vigorous debate on the questions of how the process of repression occurs, how the process of retrieval occurs, and indeed if in fact retrieval is possible at all. A central and divisive question in this debate is whether a person's memory of an event can be accurate or authentic or "true," having been long lost in the person's subconscious mind and subsequently remembered, either spontaneously or by some method seeking to recover the memory.
The phenomenon of repressing recollection of a traumatic event, and subsequently "recovering" it, may be familiar to or even accepted by parts of the psychological community, but it is far from being familiar to the average juror. . . [A] review of the scientific literature on the subject reveals . . . that ordinary jurors cannot be expected to analyze such claims without the assistance of experts.
[697 A.2d at 921 (citations omitted).]
We find Hungerford and the other cited opinions persuasive on this point. Consequently, because of the lack of expert testimony, the trial judge erred in permitting this case to go to the jury and further erred in denying the motions for a directed verdict and judgment notwithstanding the verdict.
Melissa has not argued here for a new trial if we were convinced that the lack of expert testimony entirely undermined her case. Nonetheless, we are satisfied that she ought to be afforded the opportunity to make that argument to the trial judge. We addressed this subject in Wenner v. McEldowney & Co., 102 N.J.Super. 13, 245 A.2d 208 (App.Div.), certif. denied, 52 N.J. 493, 246 A.2d 452 (1968), and noted that when a defendant moves for judgment notwithstanding the verdict the trial court
has discretionary power to grant a new trial rather than to enter judgment and should do so if it appears that the party who obtained the verdict may be able to supply the deficiency in evidence, or may win on another issue not fully tried, or for some other reason justice so requires.
[Id. at 22, 245 A.2d 208.]
Because the deficiency in this case appears to have been caused solely by Melissa, it may well be that a new trial is not warranted. See Neely v. Martin K. Eby Constr. Co., Inc., 386 U.S. 317, 318-21, 325, 87 S.Ct. 1072, 1075-76, 1078, 18 L.Ed.2d 75, 78-80, 82 (1967); Williams v. Page, 160 N.J.Super. 354, 358-59, 389 A.2d 1012 (App.Div.), certif. denied, 78 N.J. 395, 396 A.2d 582 (1978). But since that issue comes within the sound discretion of the trial judge who obviously has not ruled thereon, a determination at this point would be inappropriate. However, we note that if the trial judge determines that the interests of justice require a new trial, it may well be that the award should be conditioned on Melissa reimbursing John for his counsel fees in defending the first action. Cf. Davis v. DND/Fidoreo, Inc., 317 N.J.Super. 92, 101-02, 721 A.2d 312 (App.Div.1998), certif. denied, 158 N.J. 686, 731 A.2d 45 (1999); Maurio v. Mereck Constr. Co., Inc., 162 N.J.Super. 566, 570, 394 A.2d 110 (App.Div.1978); John Reiner & Co., Inc. v. Dorsey Roofing Co., Inc., 187 N.J.Super. 51, 55, 453 A.2d 570 (Law Div. 1982). Of course, if the judge decides that *1114 a new trial is not appropriate, then he shall enter a judgment for John.
Reversed and remanded for further proceedings consistent with this opinion.