DECISION
Pursuant to a Supreme Court directive in Quattrocchi, this Court held a preliminary evidentiary hearing in order to determine the reliability of repressed recollection, and the appropriateness of using expert testimony at trial to assist the trier of fact in understanding the scientific evidence. See Statev. Quattrocchi, 681 A.2d 879, 884 (R.I. 1996). A fourteen day hearing was held during which testimony from nine witnesses was presented, seven of whom testified as experts. In addition, the parties offered and the court considered, prior trial testimony of the complainant.
 Facts/Travel
The criminal prosecution underlying the preliminary hearing involves an indictment against the defendant, John B. Quattrocchi III ("Quattrocchi"), which charges him with two counts of first-degree sexual assault in violation of G.L. 1956 §§ 11-37-2
and 11-37-3, as amended. The alleged victim, "Gina,"[1] testified to the grand jury and the trial jury regarding memories or flashbacks of the sexual assaults which she became conscious of after a substantial interval of time in which she had no awareness or memory of the assaults. Gina underwent outpatient and inpatient psychotherapy treatment before, during, and after the recovery of these memories which formed the basis of the indictment.
In 1988, at the age of thirteen, Gina began a process of psychotherapy which would continue, with intermittent stoppages, for the next four years. Gina first worked with Linda Tschirley ("Tschirley"), R.N., in the spring of 1988.[2] Gina's therapy with Tschirley addressed sleep and appetite irregularities, loss of concentration, and mood swings.[3] In February 1989, an escalation of depression and suicidal tendencies resulted in Gina's hospitalization at Rhode Island Hospital[4]
Subsequently, Gina began treatment with Terry Bosworth ("Bosworth"), a clinical nurse specialist. Bosworth's treatment notes revealed that Gina's mother, at an initial interview with Bosworth, stated that Gina's erratic behavior began after she (the mother) had "cautioned her daughter about the potentially sexualized behavior of a family friend who had since an early age been thought of by Gina as a father figure."[5] As to this relationship with the family friend, Gina revealed to Bosworth the following information: "Upon questioning about their relationship Gina reveals that she has recently experienced some inappropriate contacts and that she has some vague recall of other episodes during her childhood that cause her discomfort to remember."[6] Bosworth's therapy notes dated April 21, 1989 stated the following: "Final topic explored today was that of her ongoing questions with regard to the events of her relationship with `Jack,' wanting her memories to return so that she can either confirm or deny the impressions that she has about their past contacts."[7]
In December 1989, Dr. David Savitzky ("Savitzky"), M.D., diagnosed Gina with bipolar disorder[8] Savitzlcy referred Gina to Patricia Gavin-Reposa ("Gavin-Reposa"), R.N., M.S.N.C.S., for therapy which began in January 1991 and continued through December 1994. Gina's treatment resumed again in December 1996.[9] Gavin-Reposa testified that the type of therapy she engaged in with Gina can be termed as problem solving whereby Gavin-Reposa followed Gina's "lead" as to the issues to be addressed and symptom management.[10] Gavin-Reposa further testified that she did not utilize sodium pentothal, hypnosis, or guided imagery in her treatment of Gina.[11] Additionally, Gavin-Reposa stated that she did not use any memory recovery technique in her therapy sessions with Gina.[12]
On July 9, 1991, seven months into treatment with Gavin-Reposa, Gina began reporting to Gavin-Reposa her concerns about possible physical or sexual abuse in her childhood.[13] The first written notation concerning the topic of sexual abuse appeared in Gavin-Reposa's July 9, 1991 therapy notes: "In today's session, Gina talks more about her concerns that there may have been an abusive or sexual relationship between she and one of her mother's boyfriends when she was very young. Gina does not recall any of the details other than some creepy feeling around this boyfriend when she runs into him on occasion now. I explained to her that as she begins to look at it more, she may notice an increase of symptoms. . . ."[14]
In the next session on July 18, 1991, Gavin-Reposa reported in her therapy notes that she and Gina had the following discussion:
 "talked more about her sort of limited recollections of some abuse in her past. She recalls riding in a car, a red Mercedes, with the gentleman and remembers various landmarks along the way which was a ride to someplace and when she gets to a certain point, she is unable to remember any more, she feels stressed by this and worried about what's going to happen when she does completely remember . . . I am very concerned about what's going to happen when she does completely remember. . . ."[15]
Gavin-Reposa's therapy notes for August 2, 1991 stated:
 "[w]e then talked about her ongoing dealing with whether or not she was sexually abused or taken advantage of in some way by one of mom's former boyfriends. Gina still is having one dream which is a recurrent dream where she's in a car with this man on her way to camp . . . he drives by, a large statute in the road, which Gina says she recalls as not being on the way to camp and this causes Gina to start crying and in her dream she wakes up and is unable to take it any further. She retraced her steps somewhat to where the statute used to be but it's no longer there. . . ."[16]
Gavin-Reposa concluded by saying that she was "concerned about the fragility of Gina's current state and worry that if she pushes herself too hard to uncover all these things that it may result in her decompensating. I advised her of the same."[17]
On September 9, 1991, Gavin-Reposa recorded in her therapy notes that she told Gina that "when she does remember what it is that is problematic for her, it may involve reporting to DCF [sic] and she's agreeable to that."[18] In the October 1, 1991 therapy notes, Gavin-Reposa reported that Gina "still cannot recall anything" about a potentially abusive relationship with her mom's old boyfriend.[19]
The October 24, 1991 therapy notes revealed that Gavin-Reposa received a telephone call from Dick Doolittle ("Doolittle") of Psychiatric Associates, a counselor for Gina's mother.[20]
Doolittle had seen Gina's mother in therapy the night before.[21] Doolittle informed Gavin-Reposa that Gina's mother told him that she (the mother) suspected that Quattrocchi had sexually abused Gina as a child.[22] Gavin-Reposa noted that "[t]his issue has come up in our therapy and Gina states that it's been a suspicion of her mother's but that Gina cannot recall any specific incident that ever happened. She really can't recall when it might have happened or what might have happened and, in fact, part of my treatment with Gina has been to help her by tore-create those memories to see if there is any actual basis forthis concern."[23] According to Gavin-Reposa's therapy notes, Doolittle stated that he felt the need to report the suspected child abuse to the Rhode Island Department of Children, Youth, and Families ("DCYF") based upon what Gina's mother had reported.[24] Gavin-Reposa informed Gina about the potential DCYF notification, and Gina expressed some concerns about this occurring.[25] Gavin-Reposa asked Gina "if there was anything she could remember and she continues to deny any recollection of any type child abuse. . . ."[26]
Gavin-Reposa concluded her therapy notes on a January 20, 1992 office visit with the statement that she would "continue to see Gina biweekly for supportive and exploratory psychotherapy."[27] However, Gina was first hospitalized at Butler Hospital adolescent unit from March 18, 1992 until March 21, 1992 due to severe depression and thoughts of suicide.[28]
The discharge diagnosis was "bipolar disorder, depressed, without psychotic features."[29] Gina was readmitted to Butler Hospital on March 23, 1992 and discharged on April 3, 1992.[30]
At Gina's first therapy session on April 6, 1992 following her hospitalization, Gavin-Reposa wrote, in part:
 ". . . It is clear that Gina recalls something about her relationship with `Jack' and I am assuming, as is her mother, that he sexually abused her, but Gina refuses to discuss it. `Nothing ever happened. He was like my father. I would never ruin his life.' I told Gina that talking would help and she continues to refuse. . . ."[31]
(Emphasis added.)
Following a session with Gina on April 15, 1992, Gavin-Reposa wrote that Gina was "feeling better than last week — denies S.I. still very hesitant to discuss ? of sexual abuse — repeatedly states `I really don't remember' but I [Gavin-Reposa] do not believe this to be so. States `he is like my Dad, he couldn't have done anything bad to me.' Plan (1) continue working towards dealing with abuse issue. . . ."[32]
On April 28, 1992, Gavin-Reposa alleged in a report to DCYF the sexual abuse of Gina by Quattrocchi.[33] On April 29, 1992, Maureen Murphy ("Murphy"), a DCYF investigator, interviewed Gavin-Reposa by telephone.[34] Gina reported to Murphy on April 29, 1992, three instances of sexual abuse committed by Quattrocchi as follows: (1) fondling her breasts in a store dressing room when she was age twelve; (2) being driven to someone's house instead of summer camp, and touching Quattrocchi's penis while pictures were being taken; and (3) digital penetration by Quattrocchi in the shower.[35]
Following a therapy session on May 4, 1992, Gavin-Reposa wrote that Gina was "dealing fairly well with fact that she reported alleged sexual abuse. Discussing difficult dichotomy of having had loving feelings for someone who sexually abused her — explained this to her as a common phenomena memories quite clear for incidents."[36]
On May 6, 1992, Gina filed a report with the Lincoln Police Department stating that Quattrocchi had committed the following acts: (1) fondled her breasts in a store dressing room while watching her undress in a store dressing room when she was about thirteen years old; and (2) at the age of four, Quattrocchi drove her to someone's house, instead of to summer camp, where he digitally penetrated her and had her touch his penis while pictures were taken.[37] In the May 19, 1992 session, Gina reported to Gavin-Reposa the following instances of sexual abuse by Quattrocchi: ". . . picture taking . . . recalls `him touching me and making me touch him'. . ., and recalls, `the shower' — `he would go in with me . . . he put his fingers inside of me. . . .;'"[38] The therapy notes concluded with Gavin-Reposa's statement of "good that she is directing anger outward at this time."[39]
At Gina's next "medication visit" on May 21, 1992 with Dr. Asher, M.D., it was noted following the printed heading "Patient Status:" that Gina felt "[f]lashbacks of abuse feels stressed by Flashbacks; little energy."[40] On June 2, 1992, Gina reported to Gavin-Reposa three more instances of sexual abuse by Quattrocchi upon her, namely: (1) oral sex on a sailing dinghy; (2) forcing Gina to touch him when her mother was sleeping on the sailboat and threatening to tell her mother if she did not; and (3) that he raped her once and told her he had to "because I was such a pretty young girl."[41]
Gina gave a written statement to the Lincoln Police Department on July 24, 1992, indicating three instances of alleged sexual abuse by Quattrocchi, namely: (1) he made Gina touch his penis when she was approximately age six or seven; (2) oral sex on a sailing dinghy when she was approximately age six; and (3) intercourse at the guest cabin at Quattrocchi's house in Lincoln when she was approximately age eight.[42] (Two of those acts formed the basis of this indictment: vaginal intercourse when Gina was approximately eight years of age in a cabin near the pool at Quattrocchi's Lincoln home, and fellatio on a boat in Narragansett Bay when Gina was between six and seven years old.)[43]
 Burden of Proof
In this preliminary hearing, the State has written it intends at re-trial, similar to its use during the prior proceeding, to offer expert testimony concerning Gina's diagnosis of Post Traumatic Stress Disorder (PTSD) in rebuttal "after the defendant open[s] the door"[44] by cross-examination of Gina. In State v.Quattrocchi, the Rhode Island Supreme Court held that when expert testimony is proffered relating to the basis for repressed recollection and for the diagnosis of Post Traumatic Stress Disorder (PTSD), which provided the rationale for such repression and flashbacks, the trial justice ". . . should exercise a gatekeeping function and hold a preliminary hearing outside the presence of the jury in order to determine whether such evidence is reliable and whether the situation is one on which expert testimony is appropriate." State v. Quattrocchi, 681 A.2d 879, 883-84 (R.I. 1996) (citing State v. Wheeler, 496 A.2d 1382, 1386-88 (R.I. 1985)).
This court, accepting the likelihood that at re-trial Quattrocchi would "open the door," rules as a matter of law that the burden of proof rests upon the State, as it does on every proponent, to satisfy the requirements for admissibility of expert testimony. R.I. R. Evid. 702; Rodriguez v. Kennedy,706 A.2d 922, 923 (R.I. 1998) (citing Wheeler, 496 A.2d at 1388); seealso Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); State v. Cote, 691 A.2d 537, 541 (R.I. 1997). In an effort to sustain its burden of proof at the hearing, the State presented the testimony of the following witnesses: Gina; Dr. Daniel Brown, Ph.D.; Patricia Gavin-Reposa, R.N., M.S.N.C.S.; Dr. Barry Wall, M.D.; and Dr. Paul Appelbaum, M.D. Quattrocchi presented the testimony of the following witnesses: Dr. Paul McHugh, M.D.; Dr. Richard Ofshe, Ph.D.; Dr. William Grove, Ph.D.; and Dr. Elizabeth Loftus, Ph.D.
 State of the Law
In Daubert, the United States Supreme Court provided guidelines which a trial court should consider in determining the admissibility of scientific evidence: (1) whether the proffered knowledge can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential error rate; and (4) whether the theory or technique has gained general acceptance in the relevant scientific discipline. Daubert, 509 U.S. at 593-94, 113 S.Ct. at 2796-97, 125 L.Ed.2d at 482-83. In Quattrocchi, while directing the trial court to use the guidelines expressed in Daubert in determining the admissibility of scientific evidence, our Supreme Court clearly stated in footnote 2 that "[o]ur citing Daubert
[citation omitted] . . . does not indicate that this court has abandoned the test enunciated in Frye [citation omitted], as analyzed in State v. Wheeler [citation omitted], and applied inState v. Dery [citation omitted]." Quattrocchi, 681 A.2d at 884, n.2. Our Supreme Court has left "to a later day the emphasis to be placed on general acceptance as set forth in both Frye andDaubert as opposed to the three other factors set forth inDaubert." Id.
The court in Frye decided the admissibility of a novel scientific testimony by setting forth the following standard:
 "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."
Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923) (emphasis added). Basically, the "general acceptance" test enunciated in Frye set the standard for determining the admissibility of scientific evidence at trial. Daubert, 509 U.S. at 585, 113 S.Ct. at 2792, 125 L.Ed.2d at 478.
In Wheeler, the Rhode Island Supreme Court, after discussing various opinions regarding the Frye test, held:
 "[W]here the subject matter of the testimony is of a mechanical, scientific, professional or like nature, none of which is within the understanding of laymen of ordinary intelligence, and where the witness seeking to testify possesses special knowledge, skill or information about the subject matter acquired by study, observation, practice or experience, the trial justice must determine if `such an individual's opinion may be heard as aid to the jury in its quest to discover the truth.'"
Wheeler, 496 A.2d at 1388 (citation omitted). However, the Dery
court reversed the trial court's decision to admit the results of a polygraph examination which supported defendant's claim of truthfulness and reaffirmed Frye by stating that ". . . before a scientific principle or discovery may be considered for its evidentiary value, it must be `sufficiently established to have gained general acceptance in the particular field in which it belongs.'" State v. Dery, 545 A.2d 1014, 1016 (R.I. 1988).
Although the United States Supreme Court stated that the Frye
standard was superseded by the Federal Rules of Evidence, our Supreme Court has made the opposite ruling. Daubert, 509 U.S. at 587, 113 S.Ct. at 2793, 125 L.Ed.2d at 479; Quattrocchi, 681 A.2d at 884, n.2. From an analysis of the foregoing cases, this court concludes that before the proffered scientific evidence can be considered, the State must prove, at a minimum, the criteria set forth in Daubert and Quattrocchi, which includes proving the theory which the expert intends to expound upon has been generally accepted within the relevant scientific community under the Frye standard.
 Evidence Regarding the Memory of the Victim
According to the testimony offered by Dr. Daniel Brown ("Brown"), Ph.D., at the preliminary hearing, the term "memory" can be subdivided into at least two categories. The two categories of "memory" consist of continuous memory and recovered memory.
I. Continuous Memory
A continuous memory is the recollection of an event which, although it may not be a current thought, is something that a person never forgot, e.g., where one was when they heard that President Kennedy had been shot and killed. According to Brown, Gina has a continuous memory of an incident she indicated occurred when she was thirteen years old while shopping at Cherry Webb. Quattrocchi went into the dressing room while Gina was trying on a sun dress. Quattrocchi pointed out that the dress was too tight around Gina's chest while rubbing her breasts.[45]
Gina has a continuous memory of an incident which occurred when she was fourteen years old while she was shopping at the Swansea Mall. Quattrocchi went into a dressing room with Gina over her objection, stating that he liked to watch her because she got excited when she tried on new clothes.[46] Gina also has a continuous memory of an incident in Quattrocchi's law office which occurred in June 1991 when she was sixteen. She went to Quattrocchi's office to tell him about her grades on final exams. Quattrocchi, she claims, pulled her down onto his lap and looked down her blouse.[47] Gina also has a continuous memory of having stopped seeing Quattrocchi following the June 1991 visit to his office.[48] She has a continuous memory that either shortly before or shortly after visiting Quattrocchi's office in June 1991, she began having a dream about him taking her in his car to summer camp (when she was a child), but he turns right instead of left and they pass by a lumberjack statute which is not on the way to camp.[49]
Gina has a continuous memory that her first memory of alleged sexual abuse by Quattrocchi occurred while she was hospitalized at Butler Hospital in March 1992.[50] She has a continuous memory that either during or following her hospitalization at Butler in March of 1992, she had her first complete recall of the alleged sexual abuse by Quattrocchi at someone's house on a day when she was supposed to be taken to summer camp, when she was approximately age four.[51]
II. Recovered Memory
A recovered memory is an event that is forgotten for a period of time but is subsequently remembered. As will be addressedinfra, controversy is rampant amongst individuals who profess knowledge within the relevant scientific communities of psychiatry, psychology, and sociology as to whether or not it can be reliably shown that repressed recollection exists.
At this point, the court is not ruling as to whether it has been shown that reliable repressed recollection as a concept exists, and whether it has been shown that Gina's recovered memory is in and of itself reliable. The State argues that the incidents alleged in the indictment were recalled by Gina through "flashbacks."[52] Gina described her recovery of memories of childhood sexual abuse as occurring "like a dream" or "flashbacks."[53] She described her "flashbacks" as a physical sensation generating mental imagery which allowed her to see and feel the whole event taking place. Gina felt like she was "there again." She did not feel her age, but felt like a little girl. Gina was awake, her eyes were closed, and her breathing changed. Gina was aware of what was going on around her, but was not really able to react to the situation. She experienced physical sensations of touch and smell.[54] Some of the flashbacks occurred when Gina was in a relaxed state, preparing to take a nap and thinking about sleeping.[55] The flashback of alleged digital penetration in the shower came when Gina was in her own shower at home washing her hair.[56]
III. Recovered Memories — Areas of Consensus
Although a major debate exists within the scientific community as to the concept of repressed recollection, the State argues that, according to its witnesses presented at the preliminary hearing, a consensus of opinions can be found in certain areas. Brown, a State expert, testified that "[i]t is possible for memories of abuse to have been forgotten for a long period of time and to be remembered."[57] Further, Brown testified that "[i]t's also possible to construct convincing pseudo memories for events that never occurred."[58] Dr. Elizabeth Loftus ("Loftus"), Ph.D., Professor of Psychology, University of Washington in Seattle, a defense expert, testified that memories for childhood sexual abuse that are recovered outside of the context of therapy are not inherently unreliable because they are forgotten for a period of time.[59] Loftus testified that people have the experience of recovery of previously non-remembered childhood sexual abuse.[60]
Furthermore, Loftus stated that in some cases of recovered memories of childhood sexual abuse, the recollections are essentially true.[61] In still other cases of recovered memories of childhood sexual abuse, the recollections are essentially false;[62] although barring exposure to suggestive influences, true recollections of childhood sexual abuse may be more common than false recollections.[63]
Dr. Paul McHugh ("McHugh"), M.D., Chairman of the Department of Psychiatry and the Director of Psychiatry at Johns Hopkins University, testified that people can forget a series of traumatic events and later remember them.[64] Loftus stated that according to the principles of ordinary memory, recovered memories are retained in the human mind in the same manner as continuous memories.[65] Additionally, according to research conducted by Loftus, people can accurately remember the gist of an event and even some of the details of an event over time without mental rehearsal[66] Mental rehearsal of a memory of an experience forestalls forgetting details of an event.[67]
Recovered memories are not inherently false just because they are retrieved through the use of memory recovery techniques.[68]
Finally, it is agreed that recovered memories are not inherently false just because they are retrieved in therapy in which suggestive techniques were used.[69]
 Admissibility of Evidence
The composition of the standard for the admissibility of scientific evidence, the criteria to be considered by the court, remains very much in dispute between the parties. The State argues for what it terms a "relaxed Daubert criteria applicable to the `soft sciences.'"[70] The State contends that the standard in establishing general acceptance should be flexible for much of the data at work in the fields of psychiatry and psychology is subjective and many theories are difficult to verify.[71] In further support of this relaxed standard, the State points to federal case law decided subsequent toQuattrocchi and Hungerford (cited infra) in which a relaxed standard is applied to the soft sciences.[72] The State reads these cases as standing for the relinquishment of Daubert's hard science criteria including the "falsifiability" or "testability" prong and the "known or potential error rate" prong.[73]
Quattrocchi, in arguing against a relaxed Daubert standard, proffers his own applicable criteria using a standard modeled after the analysis utilized in State v. Hungerford, 697 A.2d 916
(N.H. 1997). In Hungerford, the New Hampshire Supreme Court articulated the standard to be met by the proponent of repressed memory evidence. Id. The Hungerford model adopted the previously outlined four prong analysis of Daubert plus four additional factors. Id. at 925. The additional four criteria were utilized to address the Hungerford court's noted concern for the "great possibility of suggestiveness in therapy," a point to be further developed infra. Id. at 924. The four additional criteria used by the Hungerford court are as follows: (1) the age of the witness at the time the event or events occurred; (2) the length of time between the event and recovery of the memory; (3) the presence or absence of objective, verifiable corroborative evidence of the event; and (4) the circumstances attendant to the recovery of the memory, i.e., whether the witness was engaged in therapy or some other process seeking to recover memories or likely to result in recovered memories. Id. at 925 (citations omitted). In support of the application of these four additional criteria, Quattrocchi states that they "make sense and lend themselves to being applied in the case."[74] Quattrocchi also implies that the Quattrocchi
court would have, in all likelihood, adopted the additional four criteria had its decision not pre-dated the Hungerford
decision.[75]
Since the preliminary hearing on this matter, the United States Supreme Court has decided Kumho Tire Co., LTD v.Carmichael, No. 97-1709, 1999 WL 152275 (U.S. March 23, 1999). The State argues that this court has the discretion and flexibility as to which of the Daubert criteria should be applied in the case at bar.[76] Additionally, the State asserts that the Kumho court rejected the notion that the Daubert criteria constitutes a definitive checklist.[77] Id. at 6. Quattrocchi argues that the Kumho court rejected the argument that theDaubert criteria was applicable only to "hard sciences"[78]
since the gatekeeping obligation "applies to all expert testimony."[79] Id. at 5. Additionally, Quattrocchi contends that the Kumho decision allows this court to consider the additional criteria utilized by the Hungerford court.[80] Id.
at 6.
As previously noted, Quattrocchi provides direction to this court on the course to be taken in evaluating and determining the "reliability" and "appropriateness" of expert testimony on the subject of repressed recollection (or recovered memory).Quattrocchi, 681 A.2d 879 (R.I. 1996). It is decided by this Court that at a minimum, the four criteria enunciated in Daubert
and Quattrocchi are to be met in order to allow expert testimony on repressed recollection as evidence for the jury's consideration. Furthermore, it is clear to this Court that the factor examining the theory's general acceptance in the relevant scientific disciplines is of utmost and key importance in determining the ultimate admissibility of the scientific evidence offered. See Quattrocchi, 681 A.2d at 884, n.2 (for full quote see infra). Additionally, this court's reading of Kumho is consistent with the court's foregoing analysis of Daubert andQuattrocchi.
At the Rule 104 (a) hearing, the parties elected to provide, through testimony and argument, additional criteria for the Courts' consideration, such as the additional four factors cited in Hungerford. Given the broad nature of a Rule 104(a) hearing and our Supreme Court's enumeration of the Daubert criteria in its discussion of the trial court's gatekeeping function as well as this court's need to be edified on this complex scientific subject, the testimony and argument served an appropriate purpose in the court's consideration. However, while these factors played some role, thus meriting further discussion infra, the four criteria enunciated in Daubert and Quattrocchi, including the general acceptance standard enunciated in Frye, remain the critical factors for the Court's determination of admissibility.Daubert, 509 U.S. at 593-94, 113 S.Ct. at 2796-97, 125 L.Ed.2d at 482-83; Quattrocchi, 681 A.2d at 884; see Frye, 293 F. at 1013.
I. Whether the Proffered Knowledge Can Be or Has Been Tested
Whether or not a theory or technique becomes scientific knowledge is "based on generating hypotheses and testing them to see if they can be falsified." Daubert, 509 U.S. at 593, 113 S.Ct. at 2796, 125 L.Ed.2d at 483 (citation omitted). The State argues that federal case law and commentary favors the application of a relaxed Daubert criteria.[81] Federal case law and commentary allude to whether or not the Daubert criteria should be applied to the "soft sciences" since the theories and opinions in the foregoing area do not have the exactness of hard science methodologies.[82] The State maintains that the Daubert
criteria should be applied in differing degrees to the "soft sciences."[83] Quattrocchi argues that his expert testimony and various published articles conclude that the topic of repressed recollection and recovery needs further study, or that the testing completed to date has left the reliability issue undetermined.[84]
As the testimony at the preliminary hearing indicates, the experts are "deeply divided on the reliability or accuracy of recovered memories." Hungerford, 697 A.2d at 925 (citations omitted). The basis for rejection of repressed recollection as a scientific knowledge is the lack of an empirical test that will demonstrate the reliability of the memory. Id. at 926 (citations omitted). The quandary of the matter is that a complete laboratory study on repressed recollection of sexual abuse could never be attained. Id. at 926. Based upon case law, the testimony of experts, and various articles on the topic, this court finds that repressed recollection has not been tested adequately to ensure the reliability and accuracy of the recovered memory.
II. Whether the Theory or Technique Has Been Subjected to PeerReview and Publication
The concept of repressed recollection has received extensive peer review and publication as evidenced by the submission of articles by the parties and testimony of the parties' experts.[85] The "submission to the scrutiny of the scientific community is a component of `good science', in part because it increases the likelihood that substantive flaws in methodology will be detected." Id. at 925 (citing Daubert, 509 U.S. at 593, 113 S.Ct. at 2797, 125 L.Ed.2d at 483). Although the level of peer review and publication on the topic of memory repression and recovery is high, the "debate over methodology and the meaning of the results continues." Hungerford, 697 A.2d at 925. As such, this court relies upon the premise that the publication on a specific scientific theory or technique is only one factor for consideration in the admissibility of the scientific evidence, and does not necessarily correlate with the reliability of that theory or technique. Daubert, 509 U.S. at 594, 113 S.Ct. at 2797, 125 L.Ed.2d at 483.
III. The Known or the Potential Error Rate
The known or potential error rate of a scientific theory or technique is an aid in determining "the existence and maintenance of standards controlling the technique's operation" to determine the reliability and accuracy of that theory or technique.Daubert, 509 U.S. at 594, 113 S.Ct. at 2797, 125 L.Ed.2d at 483 (citations omitted). The State argues that the known or potential error rate should not apply to the behavioral sciences, which includes psychology.[86] The State contends that behavioral scientists deal with complex and intricate issues that are not easily lent to study in a laboratory setting, thus necessitating a relaxed Daubert standard.[87] Quattrocchi argues that the State's expert, Brown, did not testify as to the error rate of repressed recollection, but could only state that the error rate of a scientific technique "goes down" with the increased amount of studies.[88] Furthermore, Quattrocchi states that Brown testified he did not believe it was possible to calculate an error rate "in any area of science."[89] Lastly, Quattrocchi maintains that all the defense experts agree an error rate cannot be established for repressed recollection as there is no way to distinguish accurate and inaccurate memories in the absence of independent corroboration.[90]
The calculation or estimation of the number of "false" repressed and recovered memories is difficult to ascertain.Hungerford, 697 A.2d at 928 (Cf. Daubert, 509 U.S. at 594, 113 S.Ct. at 2797, 125 L.Ed.2d at 483). The heart of the problem lies in tracking the percentage of false memories that occur when the experts are divided as to methodology, reliability, and accuracy of repressed recollection. Id. at 928 (citations omitted). "Although some individuals who have recovered memories have since withdrawn their claims, (citation omitted), there is no way to track the percentage of such false memories, especially when the phenomenon is still subject to such vigorous debate." Hungerford, 697 A.2d at 928. Based upon case law, expert testimony, and various articles on the topic, this court finds that there is no quantifiable error rate regarding "false" repressed and recovered memories.
V. Whether the Theory or Technique Has Gained GeneralAcceptance in the Relevant Scientific Discipline and the FryeStandard
For repressed recollection testimony to be admissible at trial as a scientific principle for its evidentiary value, the court should look to whether the theory has gained general acceptance in the relevant scientific discipline. Daubert, 509 U.S. at 594, 113 S.Ct. at 2797, 125 L.Ed.2d at 483; Quattrocchi, 681 A.2d at 884. To gain general acceptance, a scientific principle must be "sufficiently established" in its field. Dery, 545 A.2d at 1016 (citing Frye, 293 F. at 1014); see also In ReOdell, 672 A.2d 457, 459 (R.I. 1996). While the general acceptance criteria is one of the enumerated guidelines set forth in Quattrocchi, our Supreme Court stated that they had not abandoned the general acceptance standard in Frye. Quattrocchi, 681 A.2d at 884, n.2. However, the general acceptance criteria set forth in Quattrocchi and the Frye general acceptance standard are both the same (collectively called "the general acceptance standard") and dictate the same analysis.
In regards to the concept of general acceptance in the relevant scientific discipline, the court in Daubert determined that a "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." Daubert, 509 U.S. at 594, 113 S.Ct. at 2797, 125 L.Ed.2d at 483 (citation omitted). Additionally, "[w]idespread acceptance can be an important factor in ruling particular evidence admissible, and a `known technique which has been able to attract only minimal support within the community,' § [citation omitted], may be properly viewed with skepticism." Id.
The State did not squarely address the general acceptance standard, choosing instead to argue, as noted, for a relaxedDaubert standard. The State did confront the general acceptance issue when it stated that "[t]hough the tenor of the discussion on recovered memories is sometimes described as acrimonious, with polarized groups staking out extreme positions on either end of the spectrum, there is consensus in the areas that are particularly important in this case . . . certain fundamental ideas about recovered memory are not disputed."[91] The areas of consensus or general acceptance, the State argues, include the existence proof that a series of traumatic events can be forgotten and remembered at a later point in time.[92] Studies in support of this proof are said to "constitute a body of scientific knowledge drawn from systematic observations of the phenomenon. Each `generation' of studies answered the methodological critiques of the former."[93]
Further, the State declares a consensus as to the point that "false memories" do occur.[94] The State emphasizes that it had established the existence of the phenomenon of recovered memories, and only the frequency of its occurrence is open to debate.[95] What remains of "pressing concern," as termed by the State, to the applicable scientific fields is understanding "how and under what conditions a recovered memory can be retrieved from memory accurately and how and under what conditions a false memory can be created."[96] Additionally, theories of causation of recovered memories are a focal point of controversy. However, the State argues that this point is not "germane" to the present matter. The State then circles back to its original proposition of general acceptance of the phenomena or existence proof of recovered memories. In sum, the State seeks to focus the Court's attention on the "fundamental fact that, based on principles of ordinary forgetting and remembering, people can forget a series of traumatic events and later reliably remember them."[97]
The State posits that recovered memories model "continuous" memories in that they are "stored or retained in the mind the same way."[98] As such, both recovered and "continuous" memories are subject to the same pattern of potential memory retention and deterioration. Despite the potential workings of retention and deterioration, the State argues that "[t]he usually accepted position" in regards to the accuracy of general autobiographical memory, meaning how well the memory corresponds to the facts of the actual event, is that the "gist" of a remembered event is accurate, but the details of the event may be lacking.[99] Based on available research, the State maintains that the gist of Gina's memories of child sexual abuse are expected to be accurate. Furthermore, the State contends that because Gina's memories of child sex abuse are "events of impact," research has revealed that the gist of such events is "highly well-retained and accurately retained over a long retention period."[100]
Quattrocchi argues that the State has not provided the requisite explanation of the repressed recollection phenomenon, thus leaving this Court in the position of having to "determine the reliability of `memories' recovered through an unexplained and unknown process."[101] Quattrocchi contends that the State's efforts to equate recovered memories with ordinary principles of forgetting and remembering fall short of the State's burden of proof.
Quattrocchi relies on the opinions of his experts, each of whom opined that the phenomenon of recovered memory is not
generally accepted within the field of psychology or any other scientific community. Dr. Paul McHugh, M.D., Chairman of the Department of Psychiatry and the Director of Psychiatry at Johns Hopkins University, testified that there is a raging controversy in the scientific world as to the existence of repressed memories.[102] He further stated that "the concept of repressed memory is gradually, and with some struggle in the field, being refuted, argued against, ultimately disappearing."[103] Dr. Richard Ofshe, Ph.D., a social psychologist serving as a full professor at the University of California at Berkeley in the sociology department, testified that the relevant scientific communities "have rejected the idea of repression . . . that there is no credible evidence suggesting that the mental mechanism known as repression, dissociative anmesia, robust repression, or traumatic amnesia exists at all. It has never been demonstrated."[104]
Additionally, Dr. William Grove, Ph.D., an Associate Professor of Psychology at the University of Minnesota, testified that the psychological community has not generally accepted the phenomenon of repressed or recovered memories.[105] Quattrocchi asked Dr. Elizabeth Loftus, Ph.D., Professor of Psychology at the University of Washington in Seattle, the following questions: "Do you have an opinion as to whether or not the theory that human beings can repress, dissociate, or block out streams of traumatic events and later recover so-called memories of those events with a predictable degree of accuracy, do you have an opinion as to whether that theory or notion has been found to be reasonably reliable by the relevant scientific or professional community."[106] Loftus responded with this opinion: "[t]hat theory is completely controversial and unsupported. . . ."[107]
As further support of Quattrocchi's contention of a lack of general acceptance of the repressed recollection phenomenon, he introduced into evidence position statements on the subject from the Canadian Psychiatric Association, the American Medical Association ("AMA"), the British Royal College of Psychiatrist (2 reports), and the Board of Directors of the Australian Psychological Society Limited. Quattrocchi stated that each paper demonstrates an attitude of "great caution" regarding acceptance of repressed recollection. Of note, the AMA paper stated that "[t]he AMA considers recovered memories of childhood sexual abuse to be of uncertain authenticity, which should be subject to external verification. The use of recovered memories is fraught with problems of potential misapplication."[108]
Our Supreme Court has elaborated upon the academic and judicial controversy surrounding the admissibility and reliability of repressed recollections, as well as supportive expert testimony. Quattrocchi, 681 A.2d at 881 ("Perhaps no area of the law has been more productive of controversy. . . ."). Our Supreme Court remanded the matter to this court for the exercise of its gatekeeping function. Quattrocchi, 681 A.2d at 884 (citingState v. Wheeler, 496 A.2d at 1386-88). Having done so by means of an exhaustive hearing session, this court determines that expert testimony relating to the basis for such repressed recollection is unreliable and, therefore, inadmissible.
This court believes that the phenomenon of repressed recollection has not gained general acceptance in the fields of psychology and psychiatry. See Frye, 293 F. at 1014. Because theories in support of repressed recollection have not gained general acceptance, they are deemed to be unreliable. Id.
This court adopts the reasoning of the Hungerford court which stated:
 "There is, however, a vigorous debate on the question of how the process of repression occurs, how the process of retrieval occurs, and indeed if in fact retrieval is possible at all. [citations omitted] A central and divisive question in this debate is whether a person's memory of an event can be accurate or authentic or `true,' having been long lost in the person's subconscious mind and subsequently remembered, either spontaneously or by some method seeking to recover the memory."
Hungerford, 697 A.2d at 921 (citations omitted). The dissension as to the accuracy and authenticity of repressed recollection prevents its categorization as reliable, and is representative of the lack of general acceptance of the theory by the members of the applicable scientific communities. This court, in formulating this decision, particularly noted the expert testimony presented by the defense. The defense experts were acknowledged by the State and its witnesses and recognized by this court to be national leaders in their respective fields.
 Additional Factors for Consideration
The State vigorously argues that Daubert's "falsifiability" or "testability" criteria be excluded from this court's evaluation of the repressed recollection phenomenon. This Court agrees that any testability criteria for the recovery of child sexual abuse memories is unavailable due to the ethical considerations implicated by such a study.[109] Typical empirical data or laboratory studies will not accompany a scientific theory of this nature, and are not a consideration in weighing the overall reliability and acceptance of the theory. However, the Hall opinion cited by the State in support of its soft science criteria argument still requires "some degree of reliability of the expert and the methods by which he has arrived at his conclusions." U.S. v. Hall, 974 F. Supp. 1198, 1202 (C.D. Ill. 1997). As noted, the degree of reliability that this court requires, the amount which equates to general acceptance, has not been established by the State.
In its consideration of the reliability of repressed recollection, the Hungerford court was particularly cognizant of the "uniquely suggestive environment of psychological therapy."Hungerford, 697 A.2d at 924. The Hungerford court set forth the following four additional factors to the Daubert four prong test to address the possible presence of suggestion in the alleged victim/witness's memory:
 ". . . (5) the age of the witness at the time the event or events occurred [citation omitted]; (6) the length of time between the event and the recovery of the memory [citation omitted]; (7) the presence or absence of objective, verifiable corroborative evidence of the event [citation omitted]; and (8) the circumstances attendant to the witness's recovery of the memory, i.e., whether the witness was engaged in therapy or some other process seeking to recover memories or likely to result in recovered memories [citation omitted]."
Id. at 925. If psychological therapy accompanies a witness' recovery of memories, Hungerford further warrants an inquiry into that process. Id. In the case where psychological therapy is used, a review of the therapist's qualifications, the type of therapy used, whether complaints of false accusations have been filed against the therapist, "whether the therapist ordinarily seeks hidden memories or believes that many psychological problems stem from sexual abuse, and whether the therapist remains detached during the process or `validates' allegations of abuse that arise" are additional considerations to be reviewed.Id. As a result of finding that repressed recollection was unreliable, the Hungerford court did not analyze the suggestiveness of the therapeutic process. Id. at 930.
Gina was seventeen years of age when she made the statements recounting sexual abuse to the Lincoln Police Department in May 1992. An indictment of Quattrocchi on two counts followed. The two acts forming the basis of the indictment are said to have occurred in 1981 and 1983, when Gina was between the ages of six and nine. Gina had recovered these memories just prior to reporting them to the police. Thus, a period of between ten and twelve years elapsed before Gina had "recovered" her memories in sufficient detail to report them. Objective and reliable corroborative evidence of the alleged events is not available.
The Hungerford court found a period of four years between the event and the memory recovery to be "a relatively small period of time," a factor working in favor of reliability. Id. at 929. A period of ten to twelve years, as evidenced by the present facts, is a significantly lengthy period of time during which the unreliability of the memory gains momentum. Citing scientific authorities, the Hungerford court found that young children have "incomplete narrative memories of traumatic events" and that "individuals are almost completely amnesic for the first few years of their own life." Id. As to Gina's age at the time of the charged events, it is no doubt likely that she had grown out of the period of "childhood amnesia" all humans experience, but she remained a young child "subject to the influence of innumerable external influences during the `retention' stage of remembering."Id. Her age at the time of the event and the substantial gap between the events and recovery rule against their reliability, favoring conditions ripe for suggestion.
Furthermore, Gina's therapy, particularly the Gavin-Reposa treatment and the attendant circumstances, create an air of suggestion as to her recovered memories. Quattrocchi argues that, in fact, Gina was "primed" by her mother and a number of therapists to believe that inappropriate sexual contact had occurred with Quattrocchi.
The defense experts testified that the course of therapy which accompanied Gina's memory recovery was highly suggestive. Based upon a review of Gavin-Reposa's therapy notes, McHugh stated that "an atmosphere of suspicion" was built.[110] McHugh stated that the therapy notes revealed many instances of leading and suggestive questions as well as bias.[111] McHugh also stated that this line of questioning offered the opportunity to attempt to recreate Gina's memories.[112] McHugh noted the following as exemplifying suggestiveness as to the therapeutic process: Gavin-Reposa's expectation that memories would be recalled;[113] Gavin-Reposa continued to pursue the issue of sexual abuse even though Gina repeatedly was in denial;[114]
Gavin-Reposa assumed that Gina had been sexually abused by Quattrocchi;[115] Gavin-Reposa assumed Gina's memories were true;[116] Gavin-Reposa did not offer the possibility that the memories might be false or in the realm of fantasy;[117] and Gavin-Reposa's treatment did not meet the applicable standard of care for a therapist.[118]
Ofshe testified that Gavin-Reposa validated, and drew attention to, a relationship between Gina's symptoms and her repressed memories.[119] Ofshe stated a link exists to "the discovery of symptoms to the target of this process which would be Mr. Quattrocchi and the possibility of repressed memory of his inappropriate actions."[120] In summary, Ofshe stated that Gavin-Reposa's repeated line of questioning regarding sexual abuse equated to "communicating to the patient the therapist's expectation that a repressed memory of sexual abuse is there."[121]
The assumption of sexual abuse held by Gina's mother and Gavin-Reposa, as evidenced by her therapy notes, prompted Dr. William Grove to testify to the following:
 "I don't know if you could get a lot of clearer evidence of a therapist's expectation that there were repressed memories of sexual abuse, and that they might be expected to emerge in the short-to-intermediate term future in therapy . . . [as to] potential priming by Gina's mother . . . [mother] told Gina prior to the emergence of what came to be termed repressed or otherwise forgotten memories of abuse, that Jack Quattrocchi had been charged with some type of child molestation-type charge, which would tend to create in the child's mind, Gina's mind, the expectation that perhaps he had done similar to her. That is what I mean by priming, that it sets up an expectation in the client's mind that something is a possibility to a greater degree than it would be before you heard such a thing."[122]
Loftus testified that Gavin-Reposa, though perhaps unwittingly, was "pursuing sex-abuse memories. She was pursuing an agenda of trying to recreate memories."[123] Furthermore, Loftus stated that "there is ample evidence that memories that follow suggestive procedure are definitely less reliable than memories that do not."[124]
The therapy undertaken by Gavin-Reposa has, therefore, an element of suggestibility that, when coupled with other reliability factors, renders the recovered memories it helped produce unreliable. Hungerford, 697 A.2d at 925. Gavin-Reposa, a Registered Nurse, denied that her therapy efforts were directed toward the recovery of repressed memories.[125] Nonetheless, expert testimony evidences that at least a measure of implicit suggestion accompanied Gavin-Reposa's therapy work with Gina. Furthermore, it appears that Gavin-Reposa did not remain "detached" during the therapeutic process and she may have, in fact, improperly "validated" Gina's sexual abuse memories, dreams, and flashbacks. Id. Therefore, under the additional criteria set forth in Hungerford repressed recollection as a scientific knowledge is unreliable.
 Conclusion
The State has not met its burden of establishing that repressed recollection is reliable and admissible as scientific evidence. As a result, expert testimony on the subject is inadmissible. The areas of consensus regarding repressed recollection remain greatly clouded by continuing and overriding division and discrepancy within the applicable fields. The status of dissension within the scientific discipline as to repressed recollection renders potential expert testimony of little assistance to the trier of fact to date.
Counsel shall submit the appropriate judgment for entry.
[1] This is the same fictitious name used by the Rhode Island Supreme Court in State v. Quattrocchi, 681 A.2d 879 (R.I. 1996). It is used consistently where the actual name appears within an exhibit.
[2] State's Ex. 6, p. 13.
[3] Id.
[4] Def.Ex.BB, Vol. 1, Tab 1, p. 18.
[5] State's Ex. 6, p. 13.
[6] Id.
[7] Id. at 17.
[8] Def. Ex. E, Bates Stamp 000146.
[9] Def. Ex. E, Bates Stamp 000128; Vol. #8, pp. 20-21.
[10] Vol. #8, pp. 22-23, 53.
[11] Id. at 51.
[12] Id. at 51.
[13] Def. Ex. E, Bates Stamp 000111.
[14] Id. at Bates Stamp 000111.
[15] Id. at Bates Stamp 000110.
[16] Id. at Bates Stamp 000109.
[17] Id.
[18] Id. at Bates Stamp 000107.
[19] Id. at Bates Stamp 000106.
[20] Id. at Bates Stamp 000103.
[21] Id.
[22] Id.
[23] Id. (Emphasis added).
[24] Id.
[25] Id.
[26] Id.
[27] Id. at Bates Stamp 000093.
[28] Def. Ex. BB, Vol. 1, Tab 7, pp. 104, 63.
[29] Id. at 66.
[30] Id. at 59, 2.
[31] Def. Ex. B, Bates Stamp 000077.
[32] Id. at Bates Stamp 000075.
[33] Def. Ex. BB, Vol. 2, Tab 2, Bates Stamp 00008, 00013, 00017 [sic].
[34] Id. at Bates Stamp 000024.
[35] Id. at Bates Stamp 00008-9, 00011.
[36] Def. Ex. E, Bates Stamp 000071.
[37] Def. Ex. A, pp. 1-6.
[38] Def. Ex. E, Bates Stamp 000070.
[39] Id.
[40] Id. at Bates Stamp 000069.
[41] Id. at Bates Stamp 000067.
[42] Defense Ex. B, pp. 7-8.
[43] A third witness statement was given by Gina to the Lincoln Police Department on November 25, 1992.
[44] State's Daubert Hearing Brief, Corrected Version, p. 57. (The full title of this memorandum is State of Rhode Island'sDaubert Hearing Brief, Corrected Version, July 13, 1998.)
[45] Vol. #1, pp. 9-10.
[46] Id. at 10.
[47] Id. at 8.
[48] Id.
[49] Id. at 9.
[50] Id. at 11.
[51] Id. at 11.
[52] Id. at 26; State's Daubert Hearing Brief, Corrected Version, p. 12.
[53] Id. at 11; State's Daubert Hearing Brief, Corrected Version, p. 12.
[54] Id. at 11-13.
[55] Id. at 12.
[56] Id. at 13.
[57] Vol. #3, p. 192 (citation omitted).
[58] Id. at 193 (citation omitted).
[59] Vol #15, p. 1877.
[60] Id. at 1880.
[61] Id.
[62] Id.
[63] Id. at 1880.
[64] Vol. #9, p. 578.
[65] Vol. #15, p. 1897.
[66] Id. at 1896.
[67] Id.
[68] Id. at 1900.
[69] Id. at 1900-01.
[70] The soft sciences include the fields of psychiatry, psychology, and sociology.
[71] State's Daubert Hearing Brief, Corrected Version, p. 22 (citation omitted).
[72] Id. at 23-26.
[73] Id. at 25 (citation omitted).
[74] Def. Brief, Corrected Version, p. 14. (The full title of this memorandum is Defendant's Brief in Support of Motion to BarRepressed Recollection Testimony, Corrected Version, July 27, 1998.
[75] Id.
[76] State's Letter dated March 26, 1999.
[77] Id.
[78] See State's Daubert Hearing Brief, Corrected Version, p. 26 (a relaxed Daubert criteria should apply to the "soft sciences").
[79] Def. Letter dated April 2, 1999.
[80] Id.
[81] State's Daubert Hearing Brief, Corrected Version, p. 23.
[82] Id. at 23-26.
[83] Id. at 25.
[84] Def. Brief, Corrected Version, pp. 43-44.
[85] State's Ex. 8, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30, 32, 33, 34, 35, and 35; Def. Ex. M, N, 0, P, Q, R, S, U, Z, AA, CC, DD, EE, GG, HH, NN, and 00.
[86] State's Daubert Hearing Brief, Corrected Version, p. 25.
[87] Id. at 25-26.
[88] Def. Brief, Corrected Version, p. 44; Vol. #3, p. 215.
[89] Id.
[90] Id. at 44-46.
[91] State's Daubert Hearing Brief, Corrected Version, p. 27.
[92] Id. at 28.
[93] Id. at 30 (citation to transcript omitted).
[94] Id.
[95] Id. at 30, 33.
[96] Id. at 30-31.
[97] Id. at 32-33.
[98] Id. at 34.
[99] Id. at 35.
[100] Id. at 36.
[101] Def. Brief, Corrected Version, p. 21.
[102] Vol. #9, p. 534.
[103] Vol. #9, p. 490.
[104] Vol. #10, pp. 872-73.
[105] Vol. #13, pp. 1290-91.
[106] Vol. #15, p. 1829.
[107] Id.
[108] Def. Brief, Corrected Version, pp. 45-46 (citation omitted).
[109] See Def. Brief, Corrected Version, p. 42.
[110] Vol. #9, p. 607.
[111] Id. at 537, 541-42.
[112] Id.
[113] Id. at 537.
[114] Id. at 612.
[115] Id. at 542.
[116] Id. at 625.
[117] Id. at 598, 602, 604, 624.
[118] Id. at 540.
[119] Vol. #10, p. 833.
[120] Id. at 835.
[121] Id. at 845.
[122] Vol. #13, pp.1345-46.
[123] Vol. #15, p. 1917.
[124] Id. at 1875.
[125] Vol. #8, p. 65.